UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PATRICK GILLESPIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:25-cv-00288-JAW |
| | ) | |
| CIGNA HEALTH AND | ) | |
| LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION TO DISMISS**

A plaintiff disabled by limb loss filed a complaint for disability discrimination against the third-party administrator of his employer-sponsored health benefits plan, alleging that the plan's categorical exclusion of microprocessor-controlled prostheses violated the Affordable Care Act's antidiscrimination provision. The third-party administrator moved to dismiss the complaint for failure to state a plausible disability discrimination claim. The court grants the motion to dismiss because the complaint defines the benefit denied too narrowly to provide a basis under the law to raise a claim for disability discrimination. Consistent with recent First Circuit caselaw, the court also grants the motion to dismiss for failure to state a claim for disability discrimination under any of the complaint's asserted discrimination theories.

## I.    BACKGROUND[1]

### A.    Procedural History

On June 2, 2025, Patrick Gillespie filed a complaint against the third-party administrator of his employer-sponsored his health care plan, Cigna Health and Life Insurance Company (Cigna), alleging Cigna's exclusion of microprocessor-controlled prostheses from his health insurance plan constitutes illegal disability discrimination. *Compl.* (ECF No. 1). On August 4, 2025, Cigna moved to dismiss Mr. Gillespie's complaint. *Def. Cigna Health and Life Ins. Co.'s Mot. to Dismiss Pl.'s Compl.* (ECF No. 16) (*Def.'s Mot.*). On August 25, 2025, Mr. Gillespie filed his response, opposing the motion to dismiss. *Pl.'s Opp'n to Def.'s Mot. to Dismiss* (ECF No. 17) (*Pl.'s Opp'n*). On September 8, 2025, Cigna filed their reply in support of their motion. *Def. Cigna Health and Life Ins. Co.'s Reply in Supp. of its Mot. to Dismiss Pl.'s Compl.* (ECF No. 18) (*Def.'s Reply*). On September 26, 2025, the Clerk's Office randomly reassigned this case to this Judge from Judge Nancy Torresen, who had retired.

### B.    Factual Background

#### 1.    Prosthetic Devices for Limb Loss or Absence

People with limb loss require the use of a prosthetic device, an artificial extension that replaces a missing body part such as an arm or leg. *Compl.* ¶ 31. The

---

[1]    For the purposes of the Defendants' motion to dismiss, the Court reviews the relevant facts as plead in the Plaintiff's verified complaint and accompanying attachments, which the Court takes as true at this stage of the proceeding.

appropriate type of prosthetic device is determined largely by the anatomical location and level of the amputation (e.g., below the knee, above the elbow, etc.). *Id.*

Although there are many kinds of prostheses available to those with limb loss or absence, in general, prosthetic devices are either mechanical or bionic. A mechanical prosthesis is considered body-powered, relying on the user's body to operate the device; whereas, a bionic prosthesis relies on more advanced technology, such as an internal sensor or motor to operate the device. A microprocessor-controlled prosthetic knee is a bionic device serving those with leg loss or absence above the knee. The device uses an internal computer (microprocessor) to monitor each phase of a person's gait cycle using a series of sensors to adjust the resistance to knee flexion (bending) and extension (straightening) to accommodate walking speed and various terrains. *Id.* ¶ 33. The primary advantage of microprocessor technology over a mechanical prosthetic knee joint is enhanced stability, which decreases the incidence of stumbles and falls and provides improved walking on all surfaces. *Id.* Microprocessor-controlled prostheses are well-established and accepted by the medical community and are a routinely prescribed treatment option for individuals with limb loss or absence who meet the appropriate medical criteria. *Id.* ¶ 35.

Medical providers use a rating system developed by Medicare to assess the needs of a person with limb loss or absence. *Id.* ¶ 36. The rating system refers to a person's "K-levels" from 0 to 4, which correspond to how well a person can use a prosthetic device. *Id.* The higher the K-level, the better a person may use a prosthetic device and the greater the benefit they receive from having a prosthetic device. *Id.*

¶¶ 36-41.  A person's K-level is determined by a licensed clinician.  *Id.* ¶ 38.  The K-levels rating system, as developed by Medicare provides:

**K-0**:   The patient does not have the ability or potential to ambulate or transfer safely with or without assistance and a prosthesis does not enhance their quality of life or mobility.

**K-1**:   The patient has the ability or potential to use a prosthesis for transfers or ambulation on level surfaces at fixed speed, typical of a household ambulator who only walks in their own home.

**K-2**:   The patient has the ability or potential for ambulation with the ability to traverse low-level environmental barriers such as curbs, stairs or uneven surfaces. This level is typical of the limited community ambulator.

**K-3**:   The patient has the ability or potential for ambulation with variable or multiple speeds. A person at level 3 is typically a community ambulator who also can traverse most environmental barriers and may have vocational, therapeutic or exercise activity that demands prosthetic use beyond simple locomotion.

**K-4**:   The patient has the ability or potential for prosthetic ambulation that exceeds basic ambulation skills, exhibiting high impact, stress, or energy levels typical of the prosthetic demands of a child, active adult, or athlete.

*Id.* ¶ 37.  A person with limb loss or absence assessed the lowest K-level, K-0, is considered "non-ambulatory" and does not benefit from a prosthetic device.  A person assessed anywhere between K-1 through K-4 would benefit from a prosthetic device.  According to Mr. Gillespie, people assessed K-2 or higher would benefit from a microprocessor-controlled prosthetic knee.  *Id.* ¶ 41.

### 2.    Patrick Gillespie's Current Condition

Patrick Gillespie, a resident of Steep Falls, Maine, is disabled by limb loss and diagnosed with ambulatory dysfunction.  *Id.* ¶¶ 28, 42.  Due to severe health complications during his adult life, both of his legs were amputated, below his knee

on his right leg and above his knee on his left leg. *Id.* ¶¶ 1, 28, 70. He therefore requires a left prosthetic knee to walk or move about safely. *Id.* ¶ 71. He has been assessed a K-level of 3, because, with the appropriate prosthetic device, he could traverse most environments. *Id.* ¶ 42. Medical coverage for a new left prosthetic knee is the subject of his complaint.

Although Mr. Gillespie initially treated his left leg with a mechanical prosthetic knee, due to its poor condition, he has had trouble with the device and needs a replacement. *Id.* ¶¶ 43, 76-79. He reports frequent falls due to the device's failure "to properly lock." *Id.* ¶¶ 43, 76-78. Mr. Gillespie's physiatrist, Dr. Benjamin Branch, assessed Mr. Gillespie's current mechanical prosthetic left knee on December 16, 2024 and found that the prosthetic no longer functions due to mechanical dysfunction and the poor shape of its componentry. *Id.* ¶¶ 76-77. According to his physiatrist, the non-functional condition of Mr. Gillespie's mechanical prosthetic knee causes him to fall frequently and is dangerous to him. *Id.* To avoid falling, Mr. Gillespie relies on a manual wheelchair. *Id.* ¶¶ 43, 77-78. However, even while using the wheelchair, Mr. Gillespie continues to fall during transfers from his wheelchair and when he attempts to walk short distances. *Id.* ¶¶ 43, 78. Around this time, a doctor prescribed Mr. Gillespie a microprocessor-controlled prosthetic left knee. *Id.* ¶¶ 1, 28. However, Mr. Gillespie could not obtain the prescribed device because his health plan excludes all microprocessor-controlled prostheses. *Id.* ¶¶ 1, 71-74.

According to Mr. Gillespie, without a microprocessor-controlled prosthetic left knee, his ability to walk, stand, reach, bend, work, exercise, and perform other

activities of daily living is severely limited, which negatively affects his overall health.  *Id.* ¶¶ 43, 79.  He reports a significant negative impact to his quality of life, including loss of community and social engagement from the isolation caused by his impaired mobility.  *Id.* ¶¶ 80-82.  Mr. Gillespie cannot volunteer with the local fire department, which he has done for more than twenty-five years, and he can no longer walk with or play basketball or catch with his six-year-old grandson.  *Id.* ¶¶ 80, 82.

### 3.    Patrick Gillespie's Employer-Sponsored Health Plan

Mr. Gillespie is enrolled in a Cigna health benefits plan sponsored by his employer.  *Id.* ¶ 1.  His employer, Beacon Sales Acquisition, Inc. (Beacon), self-funds its health plan and therefore pays for, rather than insures, its employees' covered medical expenses.  *Id.* ¶ 28; *id.*, Attach. 1 *Open Access Medical Benefits* at 5 (*Health Plan*).  As the plan sponsor, Beacon determines which benefits it will or will not offer its employees.  *Compl.* ¶ 10.  As the third-party administrator (TPA) of Beacon's health plan, Cigna designs and administers "off-the-shelf" health plans to customers, like Beacon, and provides claims administration services, including adjudicating claims according to the health plan's medical benefits.  *Id.*; *Health Plan* at 5.  Although Cigna processes and pays enrollees' claims, Beacon is ultimately responsible for reimbursing Cigna for the cost of any approved claims.  *Compl.* ¶ 9.

Beacon's health plan provides prostheses benefits to its employees.  *Id.* ¶¶ 11-13; *Health Plan* at 27, 32-33, 36-38 (listing as a "Covered Expense[ ]" any "charges made or ordered by a Physician for: the initial purchase and fitting of external prosthetic appliances and devices available only by prescription which are necessary

for the alleviation or correction of Injury, Sickness or congenital defect"). Although the health plan's benefits schedule provides "unlimited" coverage for most "External Prosthetic Appliances and Devices," including "limb prostheses; terminal devices such as hands or hooks; speech prostheses; and facial prostheses," *id.* at 27, 36, it specifically excludes certain kinds of prostheses, such as power enhancements for external prosthetic devices, microprocessor-controlled prostheses and orthoses, and myoelectric prostheses and orthoses. *Id.* at 37.

In 2023, Cigna denied Mr. Gillespie's request for coverage of a microprocessor-controlled prosthesis for his left knee because his health plan excludes all microprocessor-controlled prostheses. *Id.* ¶¶ 71-73. On or about July 7, 2023, Mr. Gillespie appealed Cigna's denial, and, on January 9, 2024, Cigna upheld its decision, citing the express exclusion of all coverage for microprocessor-controlled prostheses in Mr. Gillespie's health plan. *Id.* ¶ 74.

### 4.    Patrick Gillespie's Complaint

On June 2, 2026, Mr. Gillespie filed this putative class action against Cigna, alleging that his health plan's exclusion of microprocessor-controlled prostheses discriminates against people disabled by limb loss or absence in violation of Section 1557 of the Patient Protection and Affordable Care Act (ACA). *Id.* ¶¶ 99-114. Specifically, he alleges Cigna's microprocessor exclusion is based on "historic stigma and prejudice against people with limb loss or absence" that (1) intentionally discriminates against people with limb loss or absence; (2) is a proxy for people with

disability due to limb loss or absence; and (3) disproportionately impacts people with that disability. *Id.* ¶¶ 46-55, 56-64, 65-68, 99-114.

Mr. Gillespie seeks class wide certification, consisting of all individuals who require a microprocessor-controlled prosthesis and are enrolled in a health plan administered or insured by Cigna that excludes that device. *Id.* ¶ 89. He also seeks declaratory and injunctive relief, including an injunction requiring Cigna to provide coverage for microprocessor-controlled prostheses denied under the challenged microprocessor exclusion during the class period, as well as an order prohibiting Cigna from applying the same or similar exclusion in the future. *Id.* at 29-30.

## II.    THE PARTIES' POSITIONS

### A.    Cigna's Motion to Dismiss

Cigna moves to dismiss Mr. Gillespie's complaint for failing to state a claim for disability discrimination under Section 1557. *Def.'s Mot.* First, Cigna argues that Mr. Gillespie too narrowly defines his benefit to have a basis under the law to plead disability discrimination. *Id.* at 7-9. Second, Cigna argues Mr. Gillespie has failed to sufficiently plead either intentional or proxy discrimination. *Id.* at 9-16. Next, Cigna argues Mr. Gillespie has not stated a claim for disparate impact on disabled individuals with lower limb loss because he has failed to present any facts beyond his own claim that his mechanical prosthesis is inadequate. *Id.* at 16-17. Finally, Cigna argues that, because Mr. Gillespie failed to plead that either Cigna or Beacon received federal funding for his health plan, he has failed to sufficiently plead that Section

1557 applies to Cigna, as the statute only applies to health programs and activities receiving federal funding. *Id.* at 17-20.

## B.    Patrick Gillespie's Opposition

Mr. Gillespie opposes Cigna's motion, contending that he has sufficiently pleaded both disability discrimination and that Cigna is subject to Section 1557. *Pl.'s Opp'n.* Mr. Gillespie contends that his complaint sufficiently pleads intentional discrimination and that the history surrounding Cigna's plan design and administration demonstrates deliberate indifference. *Id.* at 6-14. Second, Mr. Gillespie maintains the microprocessor exclusion is a proxy for discrimination. *Id.* at 14-16. Next, Mr. Gillespie argues he has sufficiently pleaded disparate impact for the pleading stage. *Id.* at 17-18. Finally, Mr. Gillespie explains that every court to consider Cigna's argument has concluded that health insurers like Cigna are subject to Section 1557. *Id.* at 18-19. According to Mr. Gillespie, because his complaint's allegations are sufficient to survive Cigna's motion to dismiss, the Court should deny the motion. *Id.*

## C.    Cigna's Reply

In reply, Cigna reiterates the arguments from its motion and responds to Mr. Gillespie's opposition. *Def.'s Reply.* Cigna emphasizes that Mr. Gillespie's disability discrimination claim fails because its scope is far too narrow under the law—focusing only on the exclusion of microprocessor-controlled prostheses while ignoring that his plan covers other prosthetic devices for enrollees with limb loss. *Id.* at 1-3. Specifically, neither his complaint nor his opposition, nor any authority he cites, holds

9

that a benefits plan that covers some lower limb prostheses but not others, discriminates against individuals with lower limb loss based on their disability. *Id.*

## III.   LEGAL STANDARD

For a complaint to survive a motion to dismiss under Rule 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (first quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); and then quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). Although this does not require "detailed factual allegations," the facts plead must at least "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Thus, a facially plausible complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, dismissal is appropriate if a complaint's well-pleaded facts do not "possess enough heft to 'sho[w] that [the plaintiff] is entitled to relief." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (first alteration in original) (quoting *Twombly*, 550 U.S. at 557).

Assessing a complaint's plausibility is a context-specific task that requires "the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In the First Circuit, district courts apply a "two-step analysis." *Cardigan*

10

*Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the [counterclaim's] factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P. R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").

"Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (*en banc*) (citing *Twombly*, 550 U.S. at 555).

## IV.    DISCUSSION

### A.    Status of the Law

When Cigna's motion to dismiss came under advisement, the First Circuit had not yet addressed claims for disability discrimination under Section 1557. At that time, however, sister circuits had construed the Rehabilitation Act's protections as applicable to a Section 1557 claim for disability discrimination by a health care insurer. *See, e.g., Schmitt v. Kaiser Found. Health Plan of Was.*, 965 F.3d 945, 954 (9th Cir. 2020).

11

However, in 2026, the First Circuit published two opinions that illuminated the scope of disability discrimination claims under Section 1557. *See Whittemore v. Cigna Health and Life Ins. Co.*, No. 25-1248, 2026 U.S. App. LEXIS 8269 (1st Cir. Feb. 19, 2026); *Holland v. Elevance Health, Inc.*, 171 F.4th 126 (1st Cir. 2026). In *Whittemore*, the First Circuit confirmed that Section 1557 of the ACA, 42 U.S.C. § 18116, prohibits disability discrimination in the design or implementation of a health benefits plan adopted by a provider that receives federal funding. *Whittemore*, 2026 U.S. App. LEXIS 8269 at *2-3.

> Section 1557 provides that 'an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance' on the grounds prohibited under four federal nondiscrimination statutes. [42 U.S.C.] § 18116(a). The prohibited ground relevant here stems from Section 504 of the Rehabilitation Act ("Section 504"), which proscribes discrimination 'solely by reason of [an individual's] disability.' 29 U.S.C. § 794(a). Section 1557 applies the enforcement mechanisms provided under Section 504. 42 U.S.C. § 18116(a). Thus, 'the case law construing the Rehabilitation Act' applies to [a plaintiff's] Section 1557 claim "for disability discrimination by a health care insurer' that receives federal funding.

*Id.* (second alteration in original) (first quoting *Schmitt*, 965 F.3d at 954; then citing *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 378 (5th Cir. 2021); and then citing *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 239 (6th Cir. 2019).

*Whittemore* further confirmed that to plead disability discrimination under Section 1557, consistent with the caselaw construing disability discrimination claims under Section 504, plaintiffs must plausibly plead four elements: (1) that they are disabled; (2) that they sought benefits from a federally funded entity; (3) that they

12

were otherwise qualified to receive those benefits; and (4) that the defendant denied the plaintiffs those benefits solely by reason of their disability. *Whittemore*, 2026 U.S. App. LEXIS 8269 at *3 (quoting *Lesley v. Hee Man Chie*, 250 F.3d 47, 53 (1st Cir. 2001)).[2]

Only elements two and four are at issue here. First, Cigna argues Mr. Gillespie has not sufficiently pleaded that he was denied benefits "solely" on the basis of a disability under intentional discrimination, proxy discrimination, or disparate impact. *Def.'s Mot.* at 7-17. Second, Cigna argues Mr. Gillespie has failed to plead that Cigna is a proper defendant because he has not presented any facts to show that Cigna received federal funds with respect to his health plan provided by his employer. *Id.* at 17-20. Applying the approach set forth by the First Circuit in *Holland v. Elevance Health, Incorporated*, the Court concludes that Mr. Gillespie has failed to sufficiently plead facts showing he was denied benefits solely on the basis of his disability under any of his asserted theories, and the Court does not reach whether Cigna is a proper defendant in this action. *See Holland*, 171 F.4th 131-136 (refusing to reach other contested elements of a Section 1557 disability discrimination claim when the complaint fails under Rule 12(b)(6) to plausibly plead discrimination "solely by reason of her disability").

---

[2] Thus, considering the First Circuit's clarification that the standard for pleading disability discrimination under Section 1557 includes pleading that the defendant denied the plaintiff those benefits "solely" by reason of their disability, the Court rejects Mr. Gillespie's argument that Section 1557 does not incorporate the requirement that disability discrimination arise "solely" from the challenged practice. *See Pl.'s Opp'n* at 11 (citing 42 U.S.C. § 18116(a)).

In *Holland*, the First Circuit rejected a plaintiff's Section 1557 disability discrimination claim under theories of proxy discrimination, intentional discrimination, and disparate impact. *Id.* As for proxy discrimination, *Holland* acknowledged that the First Circuit "has never recognized a proxy discrimination theory," but assuming "the viability of such a . . . theory under Section 1557," it held the plaintiff's complaint did not survive Rule 12(b)(6) scrutiny. Similarly, in rejecting the plaintiff's deliberate indifference theory for their intentional discrimination claim,[3] *Holland* acknowledged that the First Circuit "has never held that a plaintiff alleging disability discrimination may show intentional discrimination by showing deliberate indifference," but assuming that plaintiffs may do so, they must to "allege that the defendant (1) had 'knowledge that a harm to a federally protected right is substantially likely' and (2) 'fail[ed] to act upon that likelihood.'" *Id.* at 135 (quoting *Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002)).

Finally, in rejecting the plaintiff's disparate impact theory, *Holland* clarified that "a disparate impact claim might arise . . . when an otherwise qualified disabled individual is denied *meaningful access* to the benefit that the grantee offers. *Id.* at 135 (emphasis in original) (quotation omitted). According, to *Holland*, because "the ACA's prohibition on discrimination in benefit design and implementation does not give rise to a reasonable inference that health entities must design benefits in a manner that provides coverage for every form of medically necessary treatment for a

---

[3] *Holland* also rejected outright the plaintiff's other intentional discrimination claim, which was based on a theory of facial discrimination—that the exclusion is based "solely" on the plaintiff's disability. *Id.* at 134.

disabled individual's particular condition," a disparate impact theory requires "sufficient factual allegations as to the scope of the benefits guaranteed under the ACA." *Id.* at 136.

In reviewing Cigna's motion to dismiss, the Court applies *Holland's* well-reasoned analysis to Mr. Gillespie's theories of disability discrimination. The Court also heeds the First Circuit's admonition that claims of disability discrimination cannot too narrowly define the benefit denied so as to transform antidiscrimination law into a requirement "that health entities must design benefits in a manner that provides coverage for every form of medically necessary treatment for a disabled individual's particular condition." *Id.*

B.    **Defining the Benefit**

As the Supreme Court has cautioned, disability discrimination laws do not "guarantee . . . health care precisely tailored to [one's] particular needs." *Alexander v. Choate*, 469 U.S. 287, 302-303 (1985). Indeed, "[a]ntidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is collapsed into one's definition of what is the relevant benefit." *Id.*, 301 n.21 (quoting brief for the United States as Amicus Curiae 29, n.36). Likewise, as the First Circuit has recently admonished, Section 1557 does not require health benefits plans to be designed "in a manner that provides coverage for every form of medically necessary treatment for a disabled individual's particular condition." *Holland*, 171 F.4th at 136; *see also Schmitt*, 965 F.3d at 959 ("[A] section 1557 plaintiff cannot define the benefit so narrowly as to require an insurer to curate coverage for each individual's health care

15

needs"); 89 Fed. Reg. 37522, 37604 (May 6, 2024) (Section 1557 "does not require covered entities to cover all services related to a specific disability or condition"). A threshold issue, therefore, is whether Mr. Gillespie has properly defined his benefit—a microprocessor-controlled prostheses—such that he has a basis under antidiscrimination law to pursue a claim for disability discrimination.

In the Court's view, Mr. Gillespie has too narrowly defined his benefit to provide him a legal basis to pursue his disability claim. As the Court reads his complaint, the relevant benefit is external prostheses. As his complaint makes clear, Mr. Gillespie's health plan does cover external prostheses, including for limb loss or absence, just not the specific prosthetic device he seeks—a microprocessor-controlled prosthetic knee. His complaint fails to address why the mechanical prosthetic devices available under his health plan are not just inferior to his preferred device but fail to adequately serve his needs and those of similarly disabled people as a group. *See Schmitt*, 965 F.3d at 949. Without more, the Court is left to conclude that Mr. Gillespie has so narrowly defined the scope of his benefit that it amounts to an impermissible request for Cigna "to curate coverage" according to his preferred treatment. *Schmitt*, 965 F.3d at 959; *Holland*, 171 F.4th at 136.

The Court's concern about Mr. Gillespie's narrowly defined benefit begins with his own description of the problem with his mechanical knee. As plead, Mr. Gillespie's complaint merely demonstrates that his *current* mechanical knee is "dysfunction[al]." *Id.* ¶¶ 76-79. His physiatrist attributes this to the "poor shape of his *current* prosthetic componentry," including his prosthesis's "hydraulic knee that

16

*no longer* functions and is essentially swinging freely." *Id.* ¶¶ 76-77 (emphasis supplied). In other words, the language of Mr. Gillespie's complaint confirms that his prosthetic knee is broken and requires replacement. Moreover, Mr. Gillespie's complaint makes clear that his frequent falls are *because* of his current mechanical knee's poor condition, not because of mechanical knees in general. *Id.* ¶ 78 ("According to the physiatrist, the non-functional mechanical prosthetic knee is the cause of these falls"). In fact, his complaint pleads no facts to suggest that prior to breaking, Mr. Gillespie was not well-served by his mechanical prosthetic knee, such that a new mechanical prosthetic knee would not remedy the problem with his current device.

Thus, on the Court's read of his complaint, it is likely that Mr. Gilliespie's needs could be met by a mechanical prosthetic knee. Indeed, his own complaint states that, as a person with limb loss assessed K-level 3, he "requires a left prosthetic knee to . . . safely ambulate," *id.* ¶¶ 37, 42, 71, and his complaint does nothing to dispel the obvious inference drawn from the K-level rating system that a mechanical knee likely would help with his disability—as his current mechanical prosthetic likely did before breaking. Instead, Mr. Gillespie relies on a prescription from his doctor for a microprocessor-controlled prosthetic knee combined with his assertion that a microprocessor knee would remedy the problems caused by his current mechanical knee. However, this does not answer the question whether Mr. Gillespie's issue with his current mechanical knee would not be remedied by obtaining one of the mechanical knees currently available to him under his health plan.

Furthermore, just as Mr. Gillespie has not plead that the external prostheses available under his health plan do not serve his needs, he has not plead facts to support his broader claim of disability discrimination against similarly disabled people. Mr. Gillespie invariably describes microprocessor-controlled prostheses as "the precise coverage often needed by many disabled enrollees with limb loss or absence," *Compl.* ¶ 54, or the "the predominant medical device needed by enrollees with limb loss." *Pl.'s Reply* at 4. But he provides no facts to support those conclusory statements. Moreover, Mr. Gillespie goes on to say that "[t]he vast majority of people with a limb loss or absence would benefit from a microprocessor prosthesis," but simply benefitting from the advanced technology microprocessors provide is not enough to provide a basis under the law to allege disability discrimination. *Compl.* ¶ 41. Again, Mr. Gillespie's complaint only demonstrates that *his* current mechanical knee does not meet *his* needs. He has not plead any facts to demonstrate that his needs could not be met by a new mechanical knee, much less people with limb loss or absence in general.

Indeed, the scope of Mr. Gillespie's asserted benefit is further complicated by the language of his health plan's "External Prosthetic Appliances and Devices" provision, which not only provides coverage for "limb prostheses," as well as "terminal devices such as hands or hooks; speech prostheses; and facial prostheses." *Health Plan* at 36. Moreover, the treatments excluded from the external prosthetic benefits provision, specifically excludes "power enhancements for external prosthetic devices; or microprocessor controlled prostheses and orthoses; and myoelectric prostheses and

18

orthoses." *Health Plan* at 37.  In other words, his health plan's external prosthetic benefits provision provides treatment for more than just people disabled by limb loss and its exclusionary provision excludes certain advanced-technology devices and appliances, only some of which treat limb loss or absence.  In the Court's view, Mr. Gillespie is selecting one among many prosthetic devices excluded under his health plan to target for his disability discrimination claim without even attempting to explain why or how he determined the scope of his asserted benefit under the law, particularly given that his health plan provides coverage for external prosthetic devices for those with limb loss or absence.

Thus, "absent sufficient factual allegations as to the scope of the benefits" he seeks under Section 1557, the Court cannot conclude Mr. Gillespie has plausibly defined his benefit to provide a basis under the law to plead disability discrimination. *Holland*, 171 F.4th at 136; *Schmitt*, 965 F.3d at 959.  Accordingly, Mr. Gillespie has not sufficiently defined the relevant benefit to support his claim that his health plan's exclusion of microprocessor-controlled prostheses is discriminatory against people with limb loss or absence.  To plead discrimination on that basis, Mr. Gillespie would have to allege more than simply that his current mechanical prosthetic knee does not fully serve his needs as a disabled person.

In the Court's view, there is a significant difference between a categorical exclusion that denies disabled people a benefit and a one that simply denies a preferred, or even superior, benefit among several options available to an employer in selecting the health plan it can afford.  The former is precisely the conduct

19

antidiscrimination law is designed to remedy; the latter is outside its ambit. *See Rusaki v. Pistole*, 775 F.3d 61, 79 (1st Cir. 2014) ("[U]npleasant effects . . . neither connected to any denial of access nor motivated by discriminatory intent" are "outside" disability discrimination law's "target"). This is a practical reality of our healthcare system: different employers can afford to provide a variety of health benefits to their employees, and anti-discrimination law is flexible enough to allow for those economic choices, so long as the economic line-drawing in selecting which benefits to provide is not based on disability. Otherwise, any gap in coverage could be construed as discriminatory. Thus, to define the benefit only to include microprocessor-controlled prostheses when his health plan covers many other kinds of prosthetic devices and excludes several other kinds of advance-technology prostheses and extensions, requires Mr. Gillespie's complaint to say more than plainly assert that the prosthetic devices available under his health plan are simply inferior. The Court therefore cannot conclude that the microprocessor exclusion is the kind of discriminatory policy that Section 1557 prohibits.

At bottom, Mr. Gillespie's complaint so narrowly defines his desired benefit that he has "collapsed" the microprocessor exclusion into the impermissible zone of an "empt[y]" discrimination claim in order to obtain "health care precisely tailored to his . . . particular needs." *See Choate*, 469 U.S. at 301 n.21 and 302-303 (citation omitted); *Holland*, 171 F.4th at 136 (Section 1557 does not require health benefits plans to be designed "in a manner that provides coverage for every form of medically necessary treatment for a disabled individual's particular condition"); *Schmitt*, 965

20

F.3d at 959 ("[A] section 1557 plaintiff cannot define the benefit so narrowly as to require an insurer to curate coverage for each individual's health care needs"); 89 Fed. Reg. 37604 (Section 1557 "does not require covered entities to cover all services related to a specific disability or condition"). Without more, the Court cannot conclude that Mr. Gillespie's claimed benefit is not merely the kind of preferred benefit that asks "an insurer to curate coverage for each individual's health care needs." *Schmitt*, 965 F.3d at 959.

### C.    Patrick Gillespie's Disability Discrimination Theories

Setting aside the threshold issue of Mr. Gillespie's impermissibly narrow benefit, the Court also determines that his complaint does not plausibly plead disability discrimination under any of his asserted theories: (1) intentional discrimination; (2) proxy discrimination; or (3) disparate impact.

#### 1.    Intentional Discrimination

Mr. Gillespie argues the microprocessor exclusion is a form of intentional discrimination against people disabled by limb loss or absence. *Compl.* ¶ 51. According to Mr. Gillespie, "Cigna, like other health plans, historically excluded coverage based on disability," which included not offering coverage for "prosthetic devices because those devices were generally required by individuals with disabilities." *Id.* ¶¶ 47-48. Mr. Gillespie describes the microprocessor exclusion as "the successor" to historic exclusions of external prostheses. *Id.* ¶ 52. He argues that Cigna's failure to "consider whether the Microprocessor Exclusion resulted from historic discrimination and prejudice, even when Cigna evaluated whether its benefit

21

design practices complied with the nondiscrimination requirements in the ACA" combined with the historic practice of eliminating coverage for prostheses, constitutes intentional discrimination. *Id.* ¶¶ 52-55.

It is not clear from Mr. Gillespie's complaint what theory of intentional discrimination he advances. In his opposition to Cigna's motion to dismiss, he argues his complaint sufficiently pleads two theories of intentional discrimination: facial discrimination and deliberate indifference.[4] *Pl's. Opp'n* at 6-14. In any event, Mr. Gillespie's complaint fails to sufficiently plead either theory of intentional discrimination.

### a.      Facial Discrimination

"Facial discrimination is 'by its very terms' intentional discrimination." *CRC Health Group, Inc. v. Town of Warren*, No. 2:11-cv-196-DBH, 2014 U.S. Dist. LEXIS 76239, at \*36 (D. Me. Mar. 31, 2014) (quoting *Lovell*, 303 F.3d at 1057). To succeed on his facial discrimination claim, Mr. Gillespie must show that Cigna intentionally designed the microprocessor exclusion solely because of his disability. *See Whittemore*, 2026 U.S. App. LEXIS 8269 at \*3; *Lesley*, 250 F.3d at 53.

Mr. Gilliespie's complaint fails to sufficiently plead facial discrimination. First, Mr. Gillespie's general allegations of historic discrimination against people disabled by limb loss or absence does not support the inference that Cigna

---

[4]      Notably, because Mr. Gilespie only seeks declaratory and injunctive relief, he does not need to succeed on any claim on intentional discrimination, which is only required for obtaining monetary damages. *See Schmitt*, 965 F.3d at 954 n.6.

intentionally discriminated against Mr. Gillespie and similarly disabled people in the design and administration of his specific health plan. Moreover, Mr. Gillespie's claim that Cigna did not consider whether the microprocessor exclusion resulted from historic discrimination and prejudice, when Cigna designed its benefit plans to comply the ACA is a conclusory allegation, unsupported by any facts in the complaint. *Compl.* ¶ 53. Similarly, the fact that his health plan covers mechanical prostheses undermines his argument that the microprocessor exclusion is the successor to Cigna's alleged historic discrimination against those with limb loss or absence. *Id.* ¶ 52. From this record, the Court cannot draw a plausible inference that Mr. Gillespie's health plan specifically excludes microprocessor prosthetics based solely on his disability. Indeed, it seems that an equally plausible inference is that because no health care plan covers everything, the exclusion of microprocessors is simply a matter of economic line-drawing, which is not illegal so long as it is not discriminatory. *See supra* IV.B.

Furthermore, Mr. Gillespie's claim that Cigna intentionally discriminates against those with limb loss or absence through "a standard policy of denying coverage of medically necessary prescription microprocessor-controlled prostheses to treat disabling limb differences" is undermined by the information in the record. *Compl.* ¶ 85. Cigna's publicly available coverage policy, which Mr. Gillespie attached to his opposition, makes clear that Cigna views microprocessor-controlled prosthetics as medically necessary for people with K-3 limb loss or higher. *Pl's. Opp'n*, Attach. 2,

*Cigna Medical Coverage Policy* at 4.[5] Because Mr. Gillespie's health plan is fully funded by his employer, Cigna's coverage policy reflects, however, that it is ultimately up to the plan sponsor, Mr. Gillespie's employer, to choose whether to cover these prosthetic devices, as required by the Employee Retirement Income Act.  29 U.S.C. § 1002(16)(B).  In other words, the complaint does not plead facts arousing a plausible inference that Cigna's denial of coverage for microprocessor-controlled prostheses under Mr. Gillespie's health plan is based solely on his disability.

### b.    Deliberate Indifference

The First Circuit "has never held that a plaintiff alleging disability discrimination may show intentional discrimination by showing deliberate indifference." *Holland*, 171 F.4th at 135.  However, as the First Circuit explained in *Holland*, "assuming dubitante that a plaintiff may do so," a plaintiff must "allege that the defendant (1) has 'knowledge that a harm to a federally protected right is substantially likely' and (2) 'fail[ed] to act upon that likelihood.'"  *Id.* (alteration in original) (quoting *Lovell*, 303 F.3d at 1056).

For the same reasons his facial discrimination claim fails, Mr. Gillespie has not sufficiently plead deliberate indifference.  Mr. Gillespie's conclusory allegations about the exclusion of microprocessor-controlled prostheses succeeding historic discrimination against disabled people does not demonstrate that Cigna knew that excluding coverage for microprocessor-controlled prostheses was "substantially

---

[5]    On a Rule 12(b)(6) motion, the Court may consider documents "the authenticity of which are not disputed by the parties," that are "central to plaintiffs' claim," or "sufficiently referred to in the complaint."  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *accord Irizarry Sierra v. Bisignano*, 158 F.4th 43, 49 (1st Cir. 2025).

likely" to violate Section 1557.  *Id.*  Furthermore, such general allegations of "thoughtless indifference or benign neglect is not sufficient to state a claim for deliberate indifference." *Id.* (quotation omitted).

### 2.    Proxy Discrimination

Although the First Circuit "has never recognized a proxy discrimination theory," the courts which do recognize the theory find proxy discrimination occurs when "'the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group.'"  *Holland*, 171 F.4th at 131 (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)).  In those courts, "the central inquiry is 'whether the proxy's 'fit' is 'sufficiently close' to make a discriminatory inference plausible."  *Id.* (quoting *Schmitt*, 965 F.3d at 959); *accord Fuog v. CVS Pharmacy, Inc.*, No. 20-337 WES, 2022 U.S. Dist. LEXIS 84045, at *14 (D.R.I. May 10, 2022).  For example, "discriminating against individuals with gray hair is a proxy for age discrimination because 'the "fit" between age and gray hair is sufficiently close.'"  *Pac. Shores Props.*, 730 F.3d at 1160 n.23 (quoting *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992)).

Mr. Gillespie argues that the microprocessor exclusion constitutes proxy discrimination because the exclusion "is targeted directly at individuals with limb loss or absence." *Compl.* ¶ 60.  According to Mr. Gillespie, given that microprocessor-controlled prostheses only treat enrollees disabled by limb loss or absence, there is a

25

"strong correlation between the use of microprocessor prostheses and disability," such that the "fit" between the microprocessor exclusion is sufficiently close to constitute proxy discrimination. *Compl.* ¶¶ 59-64; *Pl.'s Opp'n* at 14-16.

In the Court's view, Mr. Gillespie has not sufficiently pleaded that the microprocessor exclusion is a proxy for people with limb loss or absence. Although a proxy that "primarily" or "predominately" affects disabled people may support an inference of discrimination, that inference is undermined when the proxy is so narrowly defined that it fails to address the contested policy's ability to meet the needs of similarly disabled people. *See Schmitt*, 965 F.3d at 959 & 959 n.8. First, Mr. Gillespie has not plead any facts about what proportion of enrollees disabled by limb loss or absence, if at all, could have their needs met only by a microprocessor-controlled prosthesis rather than the mechanical prostheses available under his health plan. Although there is obviously a correlation between being disabled by limb loss or absence and the need for a prosthetic limb in general, Mr. Gillespie "must offer more than conjecture to plausibly allege that the [microprocessor exclusion] disproportionately affects people with disabilities." *Holland*, 171 F.4th at 134 (citing *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 274 (1st Cir. 2022)). Thus, Mr. Gillespie's failure to include any evidence about the proportion of people who could be treated with the prostheses covered by his health plan undermines his purported proxy's fit. *Schmitt*, 965 F.3d at 959-60 (Affirming dismissal of a proxy discrimination claim when "fit" was not adequately alleged in part because the complaint lacked details about what proportion of people would not be affected by the policy); *Smith v.*

*Walgreens Boots Alliance, Inc.*, 2024 U.S. App. LEXIS 12, at \*2-5 (9th Cir. Jan. 2, 2024).  For example, in *Schmitt*, the Ninth Circuit dismissed a Section 1557 proxy discrimination claim challenging a health plan's exclusion of all hearing loss treatment other than cochlear implants in part because the complaint failed to adequately allege that cochlear implants could not serve the needs of most individuals with hearing disability.  *Schmitt*, 965 F.3d at 959.

Moreover, the microprocessor exclusion also applies to microprocessor-controlled *orthoses*, not just to prostheses, further undermining Mr. Gillespie's claim that the microprocessor exclusion specifically targets people with limb loss or absence.  As Cigna points out in its motion, unlike microprocessor-controlled prostheses, microprocessor-controlled orthoses do not replace a limb, but rather service people across a range of conditions, such as muscle weakness, paralysis, multiple sclerosis, or stroke.  *Def.'s Mot.* at 15.  Mr. Gillespie's complaint is silent on this issue, and his opposition did not meaningfully address it.  *See Pl.'s Opp'n* at 16 ("Two wrongs do not make a right").  Furthermore, Mr. Gillespie's proxy discrimination claim fails to contend with the fact that the same exclusionary provision also excludes other kinds of "myoelectric prostheses and orthoses" and "external and internal power enhancements for external prosthetic devices."  *Health Plan* at 37.

Thus, on the record before it, the Court cannot determine whether the prostheses available under Mr. Gillespie's health plan serve the needs of most individuals with limb loss or absence.  Mr. Gillespie's complaint therefore lacks the

27

facts needed to support a plausible finding that there is a sufficiently close "fit" between those disabled by limb loss or absence and his health plan's microprocessor exclusion.  Accordingly, Mr. Gillespie fails to state a claim for proxy discrimination.

### 3.    Disparate Impact

In *Alexander v. Choate*, the Supreme Court rejected "the boundless notion that all disparate-impact showings constitute prima facie cases under [Section] 504."  469 U.S. at 299.  Instead, the *Choate* Court determined that a disparate impact claim might arise under Section 504 when an otherwise qualified disabled individual is denied "meaningful access to the benefit that the grantee offers."  *Id.* at 301.  *Choate* centered on Medicaid recipients' challenge to a proposed reduction in the number of inpatient hospital days that Tennessee's Medicaid program covered from twenty to fourteen days.  *Id.* at 289-90.  The plaintiffs argued that the reduction would disproportionately affect people with disabilities, who generally required longer care, and thus constituted unlawful discrimination under Section 504.  *Id.*  The *Choate* Court assessed Section 504 and the relevant statutes and regulations to determine the benefit guaranteed under the Medicaid Act and the scope of that benefit.  *Id.* at 303-06.  The *Choate* Court, in part, found that Section 504 did not "guarantee [disabled people] equal results from the provision of state Medicaid."  *Id.* at 304.

Similarly, in *Holland*, the First Circuit recently rejected a Section 1557 plaintiff's disparate impact claim that enrollees in the challenged health plan did not have meaningful access to certain prescription drug benefits because the claim failed to "set forth a basis to discern the scope of such benefit under the ACA."  171 F.4th at

136.   As the First Circuit explained, "the ACA's prohibition on discrimination in benefit design and implementation does not give rise to a reasonable inference that health entities must design benefits in a manner that provides coverage for every form of medically necessary treatment for a disabled individual's particular condition." *Id.* Without "sufficient factual allegations as to the scope of the benefits guaranteed under the ACA," a Section 1557 plaintiff "fails to plausibly allege lack of meaningful access, and thus her disparate impact claim fails." *Id.* Similarly, here, and as discussed above, the impermissibly narrow scope of Mr. Gillespie's asserted benefit combined with his complaint's failure to contend with the fact that his health plan provides coverage for external mechanical prostheses precludes his disparate impact claim at the threshold.

Furthermore, although it may not be necessary to provide statistical data in every action alleging disparate impact, these claims typically rely on statistical analysis to demonstrate the alleged differential impact. *See Mandala v. NTT Data, Inc.*, 975 F. 3d 202, 209 (2d Cir. 2020) ("To nudge a disparate impact claim across the line from conceivable to plausible—and, indeed, to ultimately prove such a claim— plaintiffs typically rely on statistical evidence to show a disparity in outcome between groups"); *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) ("[P]laintiffs are ordinarily required to include statistical evidence to show disparity in outcome between groups"); *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006) ("Typically, a disparate impact is demonstrated by statistics"). However, even if statistical evidence is not necessary, it is "not enough to show that

a few people are affected by a policy—rather, the disparity must be substantial enough to raise an inference of causation." *Schaw v. Habitat for Human.*, 938 F.3d 1259, 1274 (11th Cir. 2019). Mr. Gillespie's complaint is devoid of facts sufficient to arouse an inference that his health plan's exclusion of microprocessor-controlled prostheses causes a negative differential impact on enrollees disabled by limb loss or absence as compared to people without that disability.

## V.    CONCLUSION

Accordingly, the Court GRANTS Cigna Health and Life Insurance Company's Motion to Dismiss Plaintiff's Complaint (ECF No. 16) and DISMISSES Patrick Gillespie's Complaint (ECF No. 1).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of May, 2026